**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00207-CV**

_____

**IN THE INTEREST OF G.M.S. AND G.W.S.-S.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 19-02-02682-CV**

**MEMORANDUM OPINION**

Father appeals the termination of his parental rights to his two children, Gina and Greg.[1,2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (2). In two issues on appeal, Father challenges the predicate findings under section 161.001(b)(1), and argues the termination is not in the best interest of his children. *Id*. We affirm.

---

[1] Mother's parental rights were not terminated.

[2] In parental rights termination cases, to protect the identity of the minors, we refer to the children and their family members by a pseudonym. *See* Tex. R. App. P. 9.8(b)(2).

1

# Background

## A. Procedural History

This case has a long procedural history with the Texas Department of Family and Protective Services ("the Department") and in private modifications between Mother, Father and third parties. After Gina was born in 2017, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship.[3] In its Affidavit of Removal, the Department alleged neglectful supervision by Mother, illegal drug use by both Mother and Father, domestic violence between Mother and Father, and allegations of inappropriate sexual behavior and abuse by Father against the children. The trial court granted the removal and awarded conservatorship of the children to the Department. In 2019, by motion of the Department, Gina's case was severed from the original petition. The non-parent care-givers filed an intervention seeking conservatorship. The parties, including non-parent intervenors, entered into a mediated settlement agreement in January 2019. In February 2019, the trial court signed a Final Order in Suit Affecting the Parent Child Relationship as to Gina, in accordance with the mediated settlement agreement, naming the nonparent

---

[3] This petition included Mother's other child and Gina's half sibling who is not a part of this suit or appeal.

intervenors as joint managing conservators with the right to designate the primary residence of Gina, and giving possessory rights to Mother and Father.

In March 2019, August 2019, September 2019, November 2019, January 2020, February 2020, June 2020, and August 2020 Father filed petitions to modify the parent-child relationship, all of which were denied by the trial court, except for the August 2020 motion.[4]

In 2019, Mother gave birth to Greg and the parties entered a final order naming both parties joint managing conservators, with Father as the parent with the ability to designate Greg's primary residence. In April 2021, the trial court granted an Order to Modify the Parent-Child Relationship, naming both parties joint managing conservators, with Father as the parent with the right to designate Gina's primary residence. Greg's case was consolidated into Gina's cause number.

In May 2022, the Department filed a Petition to Modify, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, the initial pleading for the case before our Court today. In its affidavit for removal, the Department alleged that in May 2022, Gina reported sexual abuse to a professional. According to the affidavit, Gina stated her father "rubs her tutu a lot[,]" she has exhibited increased behavioral problems at school, and she has displayed avoidance behaviors when in the presence of Father, including "hiding and not wanting to go

---

[4] Father filed these motions first with counsel and then pro se.

3

home." Subsequently, the trial court ordered both children to be removed from Father and placed with the Department, naming the Department as temporary managing conservator of the children. In that same month, Mother answered the Department's motion and concurrently filed two motions to modify the parent child relationship as to Greg and Gina, alleging Father engaged in a history or pattern of family violence, child abuse and child neglect.

On June 15, 2022, the trial court signed agreed temporary orders regarding Greg and Gina, naming Mother sole managing conservator with the right to designate the children's primary residence and giving Father possessory conservator rights, but denying visitation with the children until a therapist recommends it. The Department's Petition for each child was dismissed, but in December 2022, the Department filed a new Petition in Intervention and for Protection, to Modify, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship with respect to Greg and Gina, alleging Mother engaged in a physical altercation with her paramour, including threating his life with a gun, physically attacking her oldest child, neglectful supervision, and physical abuse and neglect of all her children including Gina and Greg.[5] The trial court then signed an order removing the children from Mother's possession and naming the Department sole managing conservator of the children. In May 2024, after extensive motion practice

---

[5] Mother's two oldest children are not a part of this appeal.

4

between the parties, a jury trial was held, and the jury found termination of Father's parental rights is in the best interest of the children.

**B. The Trial**

**Genevieve Forey-Juarez**

Genevieve Forey-Juarez testified she was Gina's preschool teacher for the 2021-2022 school year. She described Gina as a "good student" noting that she was "happy, well-behaved, [and] participated very well in class." Towards the end of the school year, Gina's behavior changed. Forey-Juarez explained that Gina started throwing tantrums in class, at lunch, and after school, being defiant, and not wanting to leave at dismissal, something she had never done before. Forey-Juarez testified regarding the following interaction with Gina on May 4, 2022:

> A. We were in class doing -- I was with a group of students. [Gina] was -- should have been in her pre-K center but she was just not wanting to be there. She was coming up to me instead.
>
> Q. So before you saw the behavior changes, was she -- would she have always stayed in her section where she was supposed to be?
>
> A. Yeah. She typically did, yes.
>
> Q. So when these behaviors changed, you saw that change as well; is that right?
>
> A. Yes.
>
> Q. Okay. And so what did -- what did [Gina] do while you were in another section with some other students?

5

A. She told me that she didn't like when her dad touched her tutu. And that he always touched her tutu.

Q. All right. And did that concern you?

A. It did. I had never heard her say or anybody say anything like that before.

Q. All right. And did she make any movements with her arms or legs or any part of her body to tell you about that?

A. She gestured to her private area between her legs.

Q. All right. And when did she gesture that way? Was it -- at what part of her telling you that?

A. When she said that she didn't like when her dad touched her tutu.

Q. Okay. And what did you do after that happened?

A. I don't know what I immediately did; but I know as soon as I could, I went to go call the counselor and report it.

Forey-Juarez recalled that later that day Gina did not want to get on her school bus to go home.

**Victoria Lincoln**

Victoria Lincoln testified that she was the assistant principal at Gina's school on the day she made the outcry to her teacher. Before Gina's outcry, she described her visits with Gina as "happy[,]" and "not for a discipline-type issue." But noted that Gina had "excessive [non] attendance[,]" agreeing that she missed 66 days that school year. She explained that most of the absences were unexcused and that it was unusual that Gina had so many doctors in Beaumont.

6

On May 4th, Gina's teacher brought her to Lincoln's office because Gina was refusing to eat lunch. She said that while Gina was in her office, Lincoln observed Gina "putting her hands on her private parts[.]" She asked Gina if she needed to go to the bathroom and Gina said no. Gina then returned to her classroom. Later that day at dismissal, Gina refused to get on the bus. According to Lincoln, Gina was "crying, screaming[,] [and] [s]he threw herself on the ground…refusing to get up and go to the bus at all." She picked up Gina, held her, and took her to her office to call her parent. She started to calm down once she was in Lincoln's office. Father then came to the school to pick up Gina. Lincoln testified that Gina's demeanor changed as soon as Father arrived at the school. She recalled that Gina was crying and that "[s]he crawled…underneath the chair and [her father] had to pull her out from underneath the chair." After Father pulled Gina out from underneath the chair, he took her down the hallway, and Gina was "crying and screaming…reaching her hands over the hallway at me." She testified that in all her years of teaching she had never observed a child acting like this. Lincoln then spoke to the Department and a police investigator about this issue.

**Mandy Teal**

Mandy Teal testified she has been an investigator with the Department for almost eight years. Teal stated that on May 4, 2022, the Department was notified about allegations of "[s]exual abuse of [Gina] by her father[.]" After learning of the

allegations, she reviewed the parent's history with the Department, the parent's criminal history, and filed for removal. Once the Department received the trial court's order to remove the children, the Department located the children and removed them on May 9th. According to Teal, she did not interview Father regarding the allegations.

**Hilda Pernell**

Hilda Pernell testified she is the Department supervisor on this case and has been since the beginning. According to Pernell, there is currently an agreement with the Department and Mother that the Foster Parents will have permanent managing conservatorship of the children and Mother will have possessory rights, including supervised visitations. The Foster Parents are Mother's former in-laws and the children have been with the Foster Parents since September 2023. She testified both children are having their needs met by the Foster Parents' care, and the Department would have no concerns if Foster Parents were named conservators. According to Pernell, because of the allegations against Father, regardless of what services Father may complete, the Department would not feel it would be safe to return the children to Father. Based on the allegations and comments from Gina, Pernell believed it would be in the best interest of the children to terminate Father's parental rights.

**Javier Vencigonzalez**

Javier Vencigonzalez testified he has been the Department conservatorship caseworker on this case since April, 2024. He testified he is familiar with the current placement of the children, it is an appropriate home, and the Department has no concerns with the placement. Gina and Greg's half-brother is also in the home. According to Vencigonzalez, both children have special needs and are receiving appropriate therapies, medications, and care to address their needs. Vencigonzalez testified the Foster Parents have had financial difficulties in the past, but those issues are resolved, and he believes it is the best place for the children. According to Vencigonzalez, the Department would have concerns if Father's rights were not terminated, explaining "especially [Gina] and to a certain extent [Greg], the trauma that they're undergoing might even get worse and there's a safety concern as well." He testified he believes Father's parental rights should be terminated.

**Mary Phillips**

Mary Phillips testified she is currently employed as a victim assistance coordinator with the Montgomery County District Attorney's Office. Before that, she was a forensic interviewer at Children's Safe Harbor with the Montgomery County Child Advocacy Center located in Conroe. She described her training and experience, explaining that she interviewed Gina two times, with the first interview conducted on May 10, 2022. After the first interview, she noted Gina went to the

bathroom on herself and needed a change of clothes. She described Gina's demeanor during the second interview as a tentative disclosure, explaining that children "could be tentative, there could be different barriers to a disclosure and different things going on."

**Ashley Gonzalez**

Ashely Gonzalez testified she is currently a forensic interviewer with Children's Safe Harbor. She detailed her educational and professional background, including her training to become a forensic interviewer. She testified she interviewed Gina in February 2023, and she has concerns that Gina was sexually abused because she made an outcry during the interview. A copy of the forensic interview was admitted into evidence and published to the jury.

**Linda Fiato**

Linda Fiato testified she is a Court-Appointed Special Advocate for Gina and Greg. She explained she contacts the children monthly either at their placement or at school. She has access to their educational and medical records and interacts with guardians and providers to "check on their welfare and status." Fiato testified she provides monthly progress reports to the Department indicating how the parties are doing and whether any concerns have come to light. She interacts with the parents either in person or via phone or text, "to help them in any way that I can to accomplish their goals and objectives in the case plan."

Fiato testified she has been Gina and Greg's guardian ad litem since March 2023. According to Fiato, Gina is "doing well in her placement[,]" and her needs are being met, but Fiato also noted some behaviors related to trauma, in her opinion. She stated Greg is "thriving[,]" and he is making progress behaviorally, including becoming more verbal, interacting and socializing.

Fiato testified she believes it is in Gina's best interest for Father's parental rights to be terminated because she believes Father will abuse Gina and "that he presents an ongoing safety threat[.]" She also believes Father's rights should be terminated with respect to Greg because he has limited verbal skills and "is at risk for abuse from Father and unable to speak up on his own behalf about anything that might happen." After searching Father's familial contacts including his mother, ex-wife and her child, Fiato expressed concerns Father has a "history of molesting" and would sexually abuse his children. During cross-examination, Fiato agreed that some allegations against Father were administratively closed but also agreed from a CASA standpoint that no matter what services or programs Father completed, it would not change her mind that he should not have the children returned to his possession.

**John Tones**

John Tones testified he is a detective with the City of Conroe, Criminal Investigations Division. He described his educational and professional background and testified he was assigned to investigate this case after Gina's outcry that Father

touched her "tutu[.]" Detective Tones testified the investigation against Father was opened and closed two times before the current investigation, and criminal charges were filed against Father. The first investigation was closed because there was not an outcry statement made during the forensic interview. According to Tones, one of Gina's siblings later made an outcry during a forensic interview, leading to the current charges filed against Father. Father was then charged with Aggravated Sexual Assault of a Child, a first-degree felony.

**Father**

At trial, Father testified he is currently incarcerated in the Montgomery County Jail awaiting trial on the sexual abuse allegations against Gina. He detailed the procedural history of this case and stated he was named managing conservator of the children with the right to designate their primary residence in 2021. Copies of Gina's school records were admitted at trial, showing Gina was absent from school several times when she lived with Father. Father explained the absences as being for "COVID-related symptoms." The records show Gina would go to the doctor in Beaumont when she was sick, not locally in Conroe, and Father explained he chose Beaumont because it was closer to Mother. "[Mother] was living in Tarkington, which was about an hour from Beaumont because that was my plans to move out there to be on the other side of Mother." Father testified he tried to get into a doctor locally after her other pediatrician stopped seeing patients, but he did not "know how

12

to work the computer system." Father denied taking the children to doctor's appointments in Beaumont to receive gas mileage reimbursement from Medicare or Medicaid.

On May 4, 2022, Father received a phone call from Gina's school that Gina did not want to take the school bus home. When Father got to the school, Gina was in the school office and he said she was "fussy, like trying to sit down, like she did not want to come up to me and I did not know what the purpose of that was at the time." He testified Gina kept her head down the entire time and did not want to talk to him. Father said that was the first time he had ever seen Gina act like that. On May 9th, the Department removed Gina and Greg from Father's care. Father testified he had not had any contact with Gina or Greg for over two years. Father admitted he was molested as a child. Father denied Gina has ever seen his private parts. He denied ever bathing with his children or asking them to keep a secret. Father invoked his fifth amendment right regarding any questions about the sexual abuse allegations against Gina.

**Mother**

Mother testified she has four children, including Gina and Greg. Three of her children currently live with their Foster Mother. Mother detailed her mental health history and confirmed Gina and Greg were removed from her care in December 2022 after she was arrested following a fight with her boyfriend. Mother then described

13

her relationship with Father, testifying that in 2017 right before Gina was first removed from her care as a toddler, she had concerns Father was using cocaine. Mother described her relationship with Father as "[v]ery rocky, very chaotic[,]" noting that Father lied to her about his employment on "day one[,]" testifying "I feel like our whole relationship was based off of one lie from day one." Mother stated there was "a lot" of physical abuse, including times that the police were called. She recalled two instances of domestic violence from Father early in their relationship. According to Mother, if she denied Father sexual intercourse, he would "freeze me out of…his apartment[,]" or turn down the thermostat to make her uncomfortable, and she described his actions as "a game he liked to play." Mother recalled one time when she wanted to sleep on the couch to be more comfortable and Father smeared feces on her face. She would also wake up to Father standing over her and masturbating. Eventually she moved to a different unit in the same apartment complex and found out she was pregnant with Gina, but admitted she continued to have a relationship with Father and subsequently conceived Greg.

Mother testified that Father's rights as to Gina should be terminated because "I believe my daughter. I have dealt with a lot of trauma and very long healing process that we're still in. I don't think that he's a safe dad." She also expressed concern about Father's parental rights with respect to Greg, explaining "[Greg] has a speech impairment, which cause -- makes it really, really hard to understand

anything that he says. You just have to really pay attention and spend a lot of time with him to be able to understand it. I even have a hard time with it. So if there was any sexual abuse at all, he wouldn't be able to speak up for himself." Mother spoke about Father's childhood, testifying that "he went to a boys' group home for, I guess, being inappropriate with other children either his age or a little bit younger than him, around age 13[,]" and that she had concerns that Father sexually assaulted another child when he was a child. Mother stated that Father did not have a good relationship with his own mother and that he was molested when he was a teenager. Mother stated she reported Father to the Department when Gina was a baby because of his behavior towards her when he would change her diapers.

> It was like in an hour-long setting, he would change her diaper five times in one hour. That was very consistent. Anytime he would come to visit, that's all he would want to do is just take her diaper off and every time the line would change colors on her pamper. And it always made me feel like he was looking at my baby inappropriately, and that's what I reported in 2017 in that CPS case when I called.

According to Mother, Gina had many absences from school while in Father's care, but she denied being aware of the absences because she had visitation with the children only on weekends. Mother testified Father took the children to doctors in Beaumont so he could get "gas mileage reimbursement." She claimed Father used this time when he was close to the Texas/Louisiana state line to "go back and forth to the casino." Mother testified that when Gina was removed from Father, he made a missing poster for her stating Gina was kidnapped. She admitted during cross-

examination that in 2021, she agreed for Father to be named Joint Managing Conservator and to have a standard possession order. She described the Foster Parents' care of Gina and Greg as "beyond measure."

**Foster Mother**

Foster Mother testified that her son was married to Mother before he passed away, and that she has kept in contact with Mother. The children were placed with her in October 2023. As of the time of trial, the children had lived with her for several months. She testified her household has seven people, herself, her husband, her 24-year-old daughter, her granddaughter, Gina, Greg, and Gina's and Greg's older sibling. Gina and her granddaughter share a room, and Greg and his older half-brother share a room.

According to Foster Mother, Greg is in a Pre-K early education program. She testified Greg has special needs and is autistic, but he is receiving speech and occupational therapy and is "doing better." Foster Mother testified Gina has an intellectual disability, oppositional defiance disorder, attends therapy, and takes medication to help with her issues. She described Gina's sleep issues, stating "it's hard for her to fall asleep at night. We're not really sure why, just that she has to take a medication to help her fall asleep. Sometimes she gets up in the middle of the night and wanders around, but she goes back to bed." As for her oppositional defiance disorder, Gina "doesn't do what she's asked to do, and she knows she's not

16

supposed to do it[,] [b]ut her impulses tell her that she's…can do it." Foster Mother testified that she had observed Gina touching herself, and that she did it in front of other people, but the instances have stopped in recent months. Gina did have some toilet issues when she arrived but they have since been resolved. Foster Mother testified Gina does not like to be hugged or touched and has "boundary issue[s]."

Foster Mother testified that although she does not work outside the home and her husband does not work, they do not have any financial issues. Her income is currently from the children's disability checks and from her job at home, which is taking care of her mother. She testified she loves the children and is bonded to them. Her wish is for the children to remain in her home.

**Forensic Interview Videos**

At trial, three videos of Gina's forensic interviews at Children's Safe Harbor were admitted and played for the jury. In an interview dated February 13, 2023, Gina identified herself and her birthday. She identified the difference between a truth and a lie. Gina stated Father "touched her private at his house[.]" She identified her private as where she goes to the bathroom. She told the forensic interviewer Father used his hand to touch her private and gestured towards her vaginal area. In a second video recorded on the same day, Gina said Father touched the inside of her private part with his hand while she was taking a bath.

## C.    Jury Findings, Trial Court's Order, and Father's Appeal

At the conclusion of the evidence, the trial court submitted four questions to the jury, an affirmative answer to each of which required clear and convincing evidence. Question one asked the jury whether Father had knowingly placed each child or allowed each child to remain in conditions or surroundings which endangered their physical or emotional well-being. Question two asked the jury whether Father had engaged in conduct or knowingly placed each child with persons who engaged in conduct which endangered their physical or emotional well-being. Question three asked the jury whether Father had constructively abandoned the children. Lastly, question four asked the jury whether termination of Father's relationship with each of the children is in the best interest of each child. A unanimous jury answered each of the four questions "Yes."

Based on the jury's findings, the trial court signed an order terminating Father's parent-child relationship with Gina and Gregg. Father timely filed this appeal. In his first issue, Father challenges the legal and factual sufficiency for each of the jury's first three findings regarding endangerment and abandonment. In his second issue, Father challenges the legal and factual sufficiency for the jury's fourth finding regarding the best interest of the children.

**Standard of Review**

It is well established that in order to terminate a parent-child relationship, the Department must prove by clear and convincing evidence that the parent engaged in one or more of the acts or omissions set forth in Texas Family Code subsection 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b); *In the Interest of E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In the Interest of J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)); *see also In the Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (citations omitted). "Due process compels this heightened standard because terminating the parent-child relationship imposes permanent, irrevocable consequences." *In the Interest of J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (citations omitted). The Texas Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. Because due process also entitles a parent to a meaningful appeal, we apply a heightened standard of review in a parental-rights termination case. *See In the Interest of N.G.*, 577 S.W.3d at 235. The Texas Supreme Court has instructed:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable

19

to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In the Interest of J.F.C.*, 96 S.W.3d at 266 (emphasis in original); *see also In the Interest of E.N.C.*, 384 S.W.3d at 802. The evidence is legally insufficient if no reasonable factfinder could have formed a firm belief or conviction of the truth of the matter the Department sought to prove. *In the Interest of J.F.C.*, 96 S.W.3d at 266.

If the evidence is legally sufficient, the appellate court then reviews the factual sufficiency of the evidence. *Id*. In a factual sufficiency review, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. We are required to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In the Interest of J.F.C.*, 96 S.W.3d at 266. We must not substitute our judgment for that of the jury; rather, because the jury is the

20

sole judge of the credibility of the witnesses and the weight to be given to their testimony, we must give deference to the jury's findings. *In the Interest of H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In the Interest of J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005).

**Analysis**

**1. Endangerment Findings**

When, as in this case, the trial court's termination order is based on an affirmative finding that termination is in the child's best interest combined with affirmative findings of multiple predicates under section 161.001(b)(1), we may affirm if a single predicate finding is supported by sufficient evidence. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). In addition to challenging the sufficiency of the jury's finding that termination is in the children's best interest, Father challenges the sufficiency of each of the predicate findings under subsections 161.001(b)(1)(D), (E) and (N). Because "the collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E) are significant[,]" we first consider whether the evidence is sufficient to support those findings before considering the sufficiency of the other findings. *In the Interest of N.G.*, 577 S.W.3d at 234. If the evidence is sufficient to support one of these grounds, it is not necessary to address the sufficiency of the jury's constructive abandonment finding based on subsection 161.001(b)(1)(N). *See id.* at 232-33.

21

"Because evidence of grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds." *In the Interest of E.M.*, No. 09-21-00317-CV, 2022 Tex. App. LEXIS 2245, at \*16 (Tex. App.—Beaumont Apr. 7, 2022, no pet.) (mem. op.).

Subsection D allows a court to terminate a parent's rights when the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection E, a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id*. § 161.001(b)(1)(E). The statute does not define "endanger" but the Texas Supreme Court has explained that "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). To endanger a child, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*.

"Subsection D requires the endangerment to the child to be a direct result of the child's environment." *See In the Interest of J.H.*, No. 09-20-00056-CV, 2020 Tex. App. LEXIS 6189, at \*34 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem.

op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 Tex. App. LEXIS 8659, at *14 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). Termination under subsection D may be based on a single act or omission. *In the Interest of A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). Termination under subsection E "requires more than a single act and must show a conscious course of conduct." *In the Interest of C.M.C.*, 554 S.W.3d 164, 172 (Tex. Crim. App. 2018). When examining endangerment under subsection D, we consider the child's environment before the Department obtained custody. *See In the Interest of J.L.V.*, 2020 Tex. App. LEXIS 2070, at *34. When examining endangerment under subsection E, we may consider actions before and after a child's birth to establish a "course of conduct." *In the Interest of C.M.C.*, 554 S.W.3d at 172.

"Sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re K.A.R.*, No. 04-17-00723-CV, 2018 Tex. App. LEXIS 2548, at *9 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.). It is not necessary for the Department to establish sexual assault, nor that the parent was criminally charged or convicted. *In the Interest of B.S.C.F.*, No. 01-18-00907-CV, 2019 Tex. App. LEXIS 2128, at *18 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, pet. denied)

(mem. op.). Additionally, evidence of sexual abuse of other children, is relevant in determining endangerment grounds. *In re K.A.R.*, 2018 Tex. App. LEXIS 2548, at *9; *see also In the Interest of L.J.H.*, No. 05-21-00183-CV, 2021 Tex. App. LEXIS 7719, at *34 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.) "([P]redatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered.").

The Department presented evidence that Gina made a sexual abuse outcry at school and again in a forensic interview that Father "always touched her 'tutu,'" that she gestured to the area between her legs while saying "tutu," and that she did not like it when he touched her "tutu." Father testified Mother told him that "tutu" is how she referred to Gina's private area. Gina's teacher described changes in Gina's behavior towards the end of the school year leading up to the outcry statement on May 4, 2022. The jury heard testimony from the vice principal of Gina's school that Gina showed a fear of Father after her outcry and resisted going home with him, screaming as he carried her out of the school. Father testified he was incarcerated at the time of trial awaiting a criminal trial for aggravated sexual assault of Gina based on allegations he caused his hand to penetrate Gina's sexual organ. When questioned about these allegations, he invoked the 5th Amendment, and the trial court instructed

24

the jury that although it was not required to do so, it was permitted to infer that Father's answers would have been adverse to Father.

The jury heard the caseworker testify that the Department terminated Father's visitation based on safety concerns "[b]ecause of the outcries." The jury also heard the caseworker's supervisor testify that although Father had completed many services on the family service plan, in her opinion, there were no services he could complete that would make the Department feel safe in returning the children to him. A forensic interviewer with Children's Safe Harbor told the jury she followed all the protocols for conducting forensic interviews and Gina made an outcry during her interview. The jury then watched a recording of the interview, during which Gina gestured towards her vaginal area and told the forensic interviewer Father touched the inside of her private part with his hand while she was taking a bath. Foster Mother testified Gina displayed sexually inappropriate behavior when she entered her home. Mother and the guardian ad litem both expressed concerns about Greg's returning to Father because he is nonverbal and cannot speak up to protect himself or report inappropriate behavior.

Viewing the evidence in the light most favorable to the jury's findings, it cannot be said that no reasonable factfinder could have formed a firm belief or conviction of the truth of the matters the Department sought to prove. *See In the Interest of J.F.C.*, 96 S.W.3d at 266. Gina's outcry statement alone is sufficient to

25

support the jury's findings. *See In the Interest of M.H.*, No. 05-22-00017-CV, 2022 Tex. App. LEXIS 5631, at *16 (Tex. App.—Dallas Aug. 5, 2022, no pet.) (mem. op.) (citation omitted) ("[O]utcry testimony alone is sufficient to support conviction beyond a reasonable doubt. Accordingly, the trial court could have formed a firm belief or conviction that Father knowingly allowed [the children] to remain in conditions that endangered their physical or emotional well-being and that he engaged in a course of conduct that endangered them."); *In the Interest of S.M.T.*, No. 13-17-00064-CV, 2017 Tex. App LEXIS 6795, at *8 (Tex. App.—Corpus Christi July 20, 2017, pet. denied) (a jury is entitled to believe the child's outcry of sexual abuse as told by a witness from the Department and her counselors and disbelieve Father's controverting evidence). "[I]t is beyond questionable that sexual abuse is conduct that endangers a child's physical or emotional well-being." *In the Interest of R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied) (citation omitted). Additionally, "if a parent abuses a child, that conduct can support an endangerment finding as to another child." *In the Interest of D.R.*, No. 02-23-00093-CV, 2023 Tex. App. LEXIS 7223, at *40 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.)

The evidence is, therefore, legally sufficient to enable the jury to find Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* Tex.

Fam. Code Ann. § 161.001(b)(1)(D). The evidence is also legally sufficient to enable the jury to find Father engaged in a voluntary, deliberate, and conscious course of conduct endangering the physical or emotional well-being of the children. *See id.* § 161.001(b)(1)(E).

Father argues, "The testimony about [Father] sexually abusing one of his children came almost exclusively from the Safe Harbor videos." Father asserts the timing of outcry statements always came just before court dates. Father also lists several other grounds upon which a factfinder could question the credibility or reliability of the outcry statements, including but not limited to:

> [T]he child never acknowledged the difference between a truth and a lie, stated that people were wearing invisible jewelry, stated the door opened by itself when the video clearly shows she opened it. The interviewer constantly led the child by giving her options. The child refused to answer continuously asking for the interviewer to play with her. The child finally start[s] answering only after the interviewer promised to play with her. The child always takes the last option over and over in order to get the interviewer to play with her. Even when the child does answer, the sexual assault that she describes in not credible as it would not be physically possible. G.S. stated in his interview he heard his mom talking about it and his mom told him things. The same mom who was not forthcoming about the assault she perpetrated that led to the last removal.

Father also emphasizes the Department dismissed its case in May 2022 when law enforcement closed its case, administratively closed its December 2022 cases, and was uncertain of the grounds upon which the Department sought to terminate Father's rights. Father argues that in light of his challenges to the credibility of the

27

Department's evidence, "no one could find the statements made by the child to be clear and convincing." We disagree. The Texas Supreme Court has explained:

> "[A] core function of the jury under any standard of proof—including clear and convincing evidence—is to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts. In doing so, juries may consider circumstantial evidence, weigh witness credibility, and draw reasonable inferences from the evidence they choose to believe. A reviewing court may not substitute its judgment for that of the jury."

*In the Interest of C.E.*, 687 S.W.3d 304, 308-09 (Tex. 2024) (citations omitted). As a reviewing court, we are required to determine whether the evidence is sufficient to enable a factfinder reasonably to form a firm belief or conviction concerning the truth of the Department's allegations. *See In the Interest of C.H.*, 89 S.W.3d at 25. "But the court of appeals' authority to conduct a factual sufficiency analysis does not permit the court to stand in the role of a thirteenth juror." *In the Interest of A.B.*, 437 S.W.3d 498, 507 (Tex. 2014). Rather, our responsibility is to consider the entire record and determine whether the disputed evidence the jury could not reasonably have credited in favor of its endangerment findings is so significant that the jury could not reasonably have formed a firm belief or conviction that Father endangered the children as described in subsections 161.001(b)(1)(D) and (E). *See In the Interest of J.F.C.*, 96 S.W.3d at 266. Having reviewed the entire record under this standard, we conclude the evidence is factually sufficient to support the jury's findings with respect to subsections (D) and (E).

28

We need not address the sufficiency of the evidence to support the jury's findings with respect to subsection (N) regarding constructive abandonment. *See In the Interest of J.S.*, No. 09-20-00294-CV, 2021 Tex. App. LEXIS 4574, at *30 (Tex. App.—Beaumont June 10, 2021, no pet.) (mem. op.) (noting if there are multiple predicate grounds, we will affirm based on any one ground as only one is necessary to terminate parental rights); *see also* Tex. R. App. P. 47.1 (requiring appellate court to issue a written opinion as brief as practicable that addresses all issues necessary to the appeal's disposition). We overrule Father's first issue.

**2. Best-Interest Finding**

In response to question four, the jury unanimously found by clear and convincing evidence that termination of Father's relationship with each of the children is in the best interest of each child. The Court's Charge included a non-exclusive list of twenty-two factors the jury was to consider in determining the best interest of the children. These included each of the factors listed in Texas Family Code section 263.307(b) as well as each of the following factors listed by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976):

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child

29

relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

"No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in a child's best interest." *In the Int. of K.D.R.*, No. 09-24-00089-CV, 2024 Tex. App. LEXIS 5882, at *19 (Tex. App.—Beaumont Aug. 15, 2024, no pet. h.) (mem. op.). A determination of the children's best interest may be based on subjective factors or the totality of the evidence. *In the Interest of J.S.*, 2021 Tex. App. LEXIS 4574, at *32. Moreover, the same evidence that is used to establish one of the predicates under subsection 161.001(b)(1) may also be used to establish termination is in the children's best interest. *In the Interest of A.C.*, 560 S.W.3d 624, 631-32 (Tex. 2018).

As detailed above, the jury heard evidence that Father allegedly sexually assaulted Gina and at the time of trial was awaiting his criminal trial for aggravated sexual assault of a child. Considering this testimony, the jury reasonably could have concluded Father would continue to engage in conduct that would not provide the children with a safe and stable home. Additionally, the jury heard evidence both children have special needs, are receiving therapy and taking medication and are doing well in their foster placement. The jury also heard testimony the foster family would be appropriate caregivers and could provide the children with a safe environment. Foster Parents also wanted the children to remain in their care, and there was testimony the children were happy in the Foster Family and did not express

wishes to see Father. Finally, the jury heard testimony from the Department's supervisor and from the guardian ad litem that they believed termination of Father's parental rights would be in the children's best interest.

Considering the totality of the evidence in the light most favorable to the jury's finding, we conclude a jury reasonably may have formed a firm belief or conviction that termination of Father's rights was in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a), (b); *Holley*, 544 S.W.2d at 371-72. Therefore, the evidence is legally sufficient to support the jury's best-interest finding.

Father argues Foster Parents were having financial and housing issues, that eighty percent of their income comes from the children's disability checks, and that one of the children was on a waiting list for therapy at the time of trial. Acknowledging it was the jury's responsibility to determine the credibility of the witnesses, resolve conflicts in the testimony and weigh all the evidence in light of the statutory and *Holley* factors, we cannot say the disputed evidence the jury could not reasonably have credited in favor of its best-interest finding is so significant that the jury could not reasonably have formed a firm belief or conviction that termination of Father's rights is in the children's best interest. *See In the Interest of J.F.C.*, 96 S.W.3d at 266. Therefore, we conclude the evidence is also factually

sufficient to support the jury's finding that termination of Father's parental rights is in the children's best interest. We overrule Father's second issue.

## Conclusion

Having overruled both of Father's issues, we affirm the trial court's order terminating Father's rights.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on October 7, 2024
Opinion Delivered October 31, 2024

Before Golemon, C.J., Wright and Chambers, JJ.